1 | Peter Anderson, Esq., Cal. Bar No. 88891
    peteranderson@dwt.com
2 | DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
3 | Los Angeles, CA 90017-2566
Tel: (213) 633-6800
4 | Fax: (213) 633-6899

5 | Attorney for Plaintiffs
ZACHRY BROWN,
6 | NO RESERVE, INC., and
WEIMERHOUND PUBLISHING, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ZACHRY BROWN, NO RESERVE, INC., a Georgia corporation, and WEIMERHOUND PUBLISHING, INC., a Georgia corporation, <br><br>                Plaintiffs, <br><br>  v. <br><br>RYAN BENJAMIN TEDDER, and DOES 1 through 10, inclusive, <br><br>                Defendants. | Case No. 2:19-cv-8719 <br><br> COMPLAINT FOR FALSE DMCA TAKEDOWN NOTICE (17 U.S.C. § 512(f)); AND DECLARATORY RELIEF <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Zachry Brown ("Mr. Brown"), No Reserve, Inc. ("No Reserve") and Weimerhound Publishing, Inc. ("Weimerhound Publishing") (collectively, "Plaintiffs"), allege:

## JURISDICTION AND VENUE

1. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), insofar as it arises under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* (the "Copyright Act"), including 17 U.S.C. Section 512(f), and by requiring a determination of the authorship of two works and the construction of the Copyright Act and the exclusive rights provided by the Copyright Act.

2. Venue is proper in this District under 28 U.S.C. § 1400(a), insofar as defendants or their agents reside or may be found here, or, alternatively, under 28 U.S.C. § 1391(b)(1), insofar as at least one defendant resides in this District and all defendants are residents of the State of California, or, alternatively, under 28 U.S.C. § 1391(b)(2), insofar as a substantial part of the events or omissions giving rise to the claims occurred in this District, or, alternatively, under 28 U.S.C. § 1391(b)(3), insofar as at least one defendant is subject to the Court's personal jurisdiction here.

## THE PARTIES

3. Mr. Brown is an individual who is domiciled in the State of Georgia.

4. No Reserve is a Georgia corporation formed under the laws of the State of Georgia and with its principal place of business in the State of Georgia.

5. Weimerhound Publishing is a corporation formed under the laws of the State of Georgia and with its principal place of business in the State of Georgia

6. Plaintiffs are informed and believe, and upon that basis allege, that defendant Ryan Benjamin Tedder ("Defendant") is an individual domiciled in Los Angeles County, California.

7. Plaintiffs are presently unaware of the true names and/or the involvement of the defendants sued herein by the fictitious designations Does 1 through 10 and for that reason sues them by those designations. Plaintiffs will seek leave of Court to

amend this pleading to identify those defendants when their true names and involvement in the infringements hereinafter described are known.

## BACKGROUND FACTS

### The Creation of the *Nowhere Left to Go* Demo Recording

8. Mr. Brown is a professional songwriter, performing artist, musician, and recording artist who performs under the name Zac Brown and, with employees of one of his corporations, in the Zac Brown Band. Mr. Brown, individually or with the Zac Brown Band, has received multiple awards and recognitions, including, among others, Grammy Awards, Country Music Association Awards, and Platinum-designated albums.

9. Mr. Brown, through his wholly-owned company Zac Brown Collective, Inc. ("ZBCI"), owns No Reserve, which owns all rights in the sound recordings featuring performances by Mr. Brown and the Zac Brown Band. Mr. Brown, through ZBCI, also owns Weimerhound Publishing, which owns and administers Mr. Brown's interests in the musical compositions written or co-written by Mr. Brown.

10. Defendant is a professional singer, songwriter, and record producer.

11. In early March 2018, Defendant provided to Mr. Brown previously recorded elements referred to as a "start" (the "Start"), with the intention that the Start be incorporated or merged into inseparable or interdependent parts of a potential new musical composition written or co-written with Mr. Brown. Mr. Brown, Defendant, one of Defendant's engineers, Zach Skelton, and Casey Smith met in Defendant's Los Angeles, California, studio and created and recorded a musical composition and "demo" recording incorporating the Start and referred to as "Nowhere to Go" and also sometimes referred to as "Dance on Me" (the "*Nowhere Left to Go* Demo"). It was always understood and agreed that Mr. Brown had ultimate and sole control and discretion as to the elements to be included in, and the completion and Plaintiffs' release of, the *Nowhere Left to Go* recording and musical composition. Immediately upon completion of the *Nowhere Left to Go* Demo, Defendant caused the *Nowhere*

*Left to Go* Demo audio files to be sent to Mr. Brown's engineer, Mr. Skelton, for additional review, revision, and recording.

12. On March 10, 2018, Mr. Brown recorded additional parts of the *Nowhere Left to Go* Demo and Mr. Brown's engineer then prepared a "rough mix" of the recording and sent it to Mr. Skelton and Defendant. Approximately one week later, Mr. Skelton or Defendant sent Mr. Brown a revised version of the *Nowhere Left to Go* Demo and Mr. Brown chose not to adopt the revisions that were not acceptable to him.

**The Creation of the *Nowhere Left to Go* Sound Recording**

13. Following the creation of the *Nowhere Left to Go* Demo, Mr. Brown and Defendant continued to communicate, including with respect to the completion of the *Nowhere Left to Go* sound recording.

14. On or about October 4-5, 2018, Mr. Brown, Defendant, and others, including another of Defendant's engineers, worked together in Defendant's Los Angeles, California, studio to create the recorded musical composition titled *Need This*. During the course of those sessions, Mr. Brown asked if that engineer also had the *Nowhere Left to Go* recording so that Mr. Brown and Defendant could work on that recording too, but the engineer did not have it.

15. On or about October 8, 2018, Mr. Brown contacted Defendant and raised the possibility of Mr. Brown providing the *Nowhere Left to Go* recording to one of Defendant's engineers to assist in finalizing the *Nowhere Left to Go* recording. Defendant did not object to Mr. Brown continuing to work on the *Nowhere Left to Go* recording and undertook to get back to Mr. Brown the next day, but failed to do so.

16. When Defendant failed to contact Mr. Brown as Defendant had undertaken, Defendant, with others, continued to work towards completion of the *Nowhere Left to Go* recording.

17. On or about February 12, 2019, Mr. Brown again contacted Defendant about completing the *Nowhere Left to Go* recording. Mr. Brown also indicated that he needed a few more songs for the album he was recording and invited Defendant to

3

submit additional song ideas to Mr. Brown. Defendant again did not object to Mr. Brown continuing to work on the *Nowhere Left to Go* recording, and submitted additional song ideas for Mr. Brown's consideration for the album.

18. On or about March 16, 2019, Mr. Brown asked Defendant to come to Nashville, Tennessee, in April 2019, to complete the *Nowhere Left to Go* recording and possibly work on other recordings for Mr. Brown's next album. Defendant responded, "Nashville trip would be fun and I love working with you." Defendant said that he would check his availability, but, again, Defendant never got back to Mr. Brown and did not attend the April 2019 recording sessions in Nashville.

19. On or about June 3, 2019, Mr. Brown sent Defendant a sound recording of his then-current recording of *Nowhere Left to Go*.

20. However, in a sudden reversal from Defendant's prior communications with Mr. Brown, Defendant responded that he did not realize that Mr. Brown was pursuing the completion of the *Nowhere Left to Go* recording and that Defendant had told Diplo, another songwriter and record producer, that Diplo could use the Start to create a different sound recording.

21. By July 2019, Plaintiffs completed the *Nowhere Left to Go* sound recording (the "*Nowhere Left to Go* Recording"), which embodies the *Nowhere Left to Go* musical composition (the "*Nowhere Left to Go* Composition") (collectively, *Nowhere Left to Go*"), and Plaintiffs continued to work on the creation and completion of other sound recordings intended to comprise Mr. Brown's next album.

22. In or about July 2019, Defendant's personal manager approached Mr. Brown's personal manager and asked that Plaintiffs delay publicly releasing *Nowhere Left to Go* until simultaneously with, or after, the new recording that Diplo had produced was released as a single in August of 2019. At no time did Defendant's personal manager dispute Plaintiffs' right to publicly release *Nowhere Left to Go* prior to the new recording by Diplo or otherwise. However, Plaintiffs did not intend to

///

release *Nowhere Left to Go* until the album on which it would appear was completed and did not anticipate that to occur until September 2019.

23. In or about August 2019, Defendant's personal manager contacted Mr. Brown's personal manager again and advised that the recording that Diplo had produced was not going to be released in August 2019 as originally planned and asked that Mr. Brown further delay his release of *Nowhere Left to Go*. Mr. Brown's personal manager declined to agree that Plaintiffs delay publicly releasing *Nowhere Left to Go*.

**Defendant's Claim to "First Use" Rights and Authorship of the**
***Nowhere Left to Go* Musical Composition and Sound Recording**

24. In or about August 2019, Plaintiffs had completed sufficient new sound recordings to release either a double album or two new albums. Sometime in August, 2019, Plaintiffs decided to split the material that had been recorded for Mr. Brown's next album into two albums, one to be titled *The Controversy* ("*The Controversy* Album") and which would include *Nowhere Left to Go*.

25. Pursuant to a non-exclusive license granted by No Reserve to TuneCore, Inc. ("TuneCore"), TuneCore commercially released *The Controversy* Album, including *Nowhere Left to Go,* on or about September 27, 2019, through digital retail platforms throughout the United States.

26. However, on or about September 27, 2019, defendants Tedder and Does 1 through 10 (collectively, "Defendants") caused to be submitted to TuneCore a purported "DMCA Takedown Notice of Infringement" (the "Purported Takedown Notice") claiming that Defendant owns a copyright interest in the *Nowhere Left to Go* Recording; that Defendant wrote the *Nowhere Left to Go* Composition; that Defendant did not grant permission for Plaintiffs to publicly release *Nowhere Left to Go*; that Defendant has the exclusive right to issue a "first use" license of *Nowhere Left to Go*; that Plaintiffs' *Nowhere Left to Go*, including in *The Controversy* Album, "constitutes willful and actionable copyright infringement"; and that TuneCore's continued

///

5

commercial release of *Nowhere Left to Go*, including in *The Controversy* Album, would constitute a "continuing infringement of [Defendant's] copyright interests."

27. Defendants' Purported Takedown Notice was and is factually false and legally incorrect, including because, *inter alia*, No Reserve is either the sole or a joint owner of the *Nowhere Left to Go* Recording and its copyright and Weimerhound Publishing is a joint author of the *Nowhere Left to Go* Composition and its copyright, in which Mr. Brown is a beneficial owner, and, as a result, Plaintiffs have every right to grant a non-exclusive license to publicly distribute and perform *Nowhere Left to Go* and Plaintiffs have not infringed any copyright rights of Defendant.

28. As a direct and intended result of Defendants' Purported Takedown Notice, TuneCore notified digital retail platforms of the claim and, as a result, digital retail platforms removed *The Controversy* Album, including *Nowhere Left to Go*, from commercial release, and although various digital retail platforms have since resumed the commercial release of *The Controversy Album* without *Nowhere Left to Go*, TuneCore and digital retail platforms have refused to resume the commercial release of *Nowhere Left to Go*, thereby directly interfering with Plaintiffs' rights in and to *Nowhere Left to Go* and Mr. Brown's right to songwriter royalties and other payments.

## FIRST CLAIM FOR RELIEF

**(For False DMCA Takedown Notice; 17 U.S.C. Section 512(f))**

**(Against All Defendants)**

29. Plaintiffs refer to and re-allege each and every allegation contained in paragraphs 1 through 28, inclusive, above, as if set forth herein.

30. Defendants' Purported Takedown Notice contains multiple false and misleading representations, including, *inter alia*:

    (a) That Defendant's authorization was and is required for Plaintiffs to commercially release *Nowhere Left to Go*;

///

///

6

      (b)    That Plaintiffs' authorization of the commercial release of *Nowhere Left to Go*, including in *The Controversy Album*, "constitutes willful and actionable copyright infringement";

      (c)    That TuneCore's continued commercial release of *Nowhere Left to Go*, including in *The Controversy* Album, will constitute a "continuing infringement of [Defendant's] copyright interests"; and

      (d)    That the statements contained in the Purported Takedown Notice are accurate.

31.    Contrary to Defendants' representations in their Purported Takedown Notice, Plaintiffs include either the sole or joint owners of the *Nowhere Left to Go* Recording and its copyright and include a joint owner of the *Nowhere Left to Go* Composition and its copyright, and—pursuant to well-established law that a copyright owner, and any copyright co-owner, may grant a non-exclusive license—Plaintiffs have every right to grant a non-exclusive license to publicly distribute and perform *Nowhere Left to Go*, including in *The Controversy* Album. As a result, Defendants could not in fact have believed in good faith that Plaintiffs' authorization of the commercial release of *Nowhere Left to Go*, including in *The Controversy* Album, constituted copyright infringement.

32.    As a direct and proximate result of Defendants' false Purported Takedown Notice, Plaintiffs have suffered and are continuing to suffer damages, including but not limited to lost revenues and damage to reputation, in an amount to be proven at trial.

33.    Defendants' Purported Takedown Notice has caused substantial damages to Plaintiffs and, unless Defendants are enjoined and directed to cease and withdraw their Purported Takedown Notice, will continue to cause Plaintiffs substantial damages. Accordingly, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief.

///

34. Pursuant to 17 U.S.C. Section 512(f), Plaintiffs also are entitled to recover their attorneys' fees and costs from Defendants.

## SECOND CLAIM FOR RELIEF

### (For Declaratory Relief)

### (Against All Defendants)

35. Plaintiffs refer to and re-allege each and every allegation contained in paragraphs 1 through 28 and 30 through 31, inclusive, above, as if set forth herein.

36. Plaintiffs contend, *inter alia*, that:

(a) No Reserve is the sole owner of the sound recording copyright in the *Nowhere Left to Go* Recording or, at a minimum, is a joint owner of that copyright and work, and, in either event, is entitled to issue, including to TuneCore, a non-exclusive license to reproduce the *Nowhere Left to Go* Recording in phonorecords, to publicly distribute those phonorecords, and to publicly perform the *Nowhere Left to Go* Recording, and to authorize others to do so;

(b) Weimerhound Publishing is a joint owner of the musical composition copyright in the *Nowhere Left to Go* Composition and is entitled to issue, including to TuneCore, a non-exclusive license to reproduce the *Nowhere Left to Go* Composition in phonorecords, to publicly distribute those phonorecords, to publicly perform the *Nowhere Left to Go Composition*, and to authorize others to do so;

(c) Defendant has no right under the Act, including any so-called "first use" right, and no contractual or other right, to prevent Plaintiffs from issuing a non-exclusive license to reproduce, publicly distribute, and publicly perform *Nowhere Left to Go*;

(d) Plaintiffs have not infringed any copyright rights of Defendant; and

///

(e) There is no merit to Defendants' objections, including Defendants' Purported Takedown Notice, to Plaintiffs' non-exclusive license to reproduce, publicly distribute, and publicly perform *Nowhere Left to Go*.

Plaintiffs are informed and believe, and upon that basis allege, that Defendants dispute the foregoing contentions, and each of them.

37. A judicial declaration of the respective rights and obligations of Plaintiffs and defendants is necessary and appropriate.

**PRAYER**

**WHEREFORE,** Plaintiffs Zachry Brown, No Reserve, Inc., and Weimerhound Publishing, Inc., pray for judgment as follows:

1. On the First Claim for False DMCA Takedown Notice against all Defendants:

(a) Damages in an amount to be proven at trial;

(b) That Defendants be enjoined from persisting in asserting their Purported Takedown Notice or otherwise claiming that Plaintiffs' commercial release of *Nowhere Left to Go*, including in *The Controversy* Album, constitutes copyright infringement of copyright rights claimed by Defendant;

2. On the Second Claim for Relief for declaratory relief against all Defendants, a judicial declaration in accordance with Plaintiffs' contentions, including that:

(a) No Reserve is the sole owner of the sound recording copyright in the *Nowhere Left to Go* Recording or, at a minimum, is a joint owner of that copyright and work, and, in either event, is entitled to issue, including to TuneCore, a non-exclusive license to reproduce the *Nowhere Left to Go* Recording in phonorecords, to publicly distribute those phonorecords, and

///

to publicly perform the *Nowhere Left to Go* Recording, and to authorize others to do so;

(b) Weimerhound Publishing is a joint owner of the musical composition copyright in the *Nowhere Left to Go* Composition and is entitled to issue, including to TuneCore, a non-exclusive license to reproduce the *Nowhere Left to Go* Composition in phonorecords, to publicly distribute those phonorecords, to publicly perform the *Nowhere Left to Go Composition*, and to authorize others to do so;

(c) Defendant has no right under the Act, including any so-called "first use" right, and no contractual or other right, to prevent Plaintiffs from issuing a non-exclusive license to reproduce, publicly distribute, and publicly perform *Nowhere Left to Go*;

(d) Plaintiffs have not infringed any copyright rights of Defendant; and

(e) There is no merit to Defendants' objections, including Defendants' Purported Takedown Notice, to Plaintiffs' non-exclusive license to reproduce, publicly distribute, and publicly perform *Nowhere Left to Go*.

3. For prejudgment interest on all sums awarded;

4. For Plaintiffs' costs of suit and attorneys' fees; and

5. For such other and further relief as the Court deems just and proper.

Dated: October 10, 2019

/s/ Peter Anderson
Peter Anderson, Esq.
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiffs
ZACHRY BROWN,
NO RESERVE, INC., and
WEIMERHOUND PUBLISHING, INC.

## **DEMAND FOR JURY TRIAL**

Plaintiffs Zachry Brown, No Reserve, Inc., and Weimerhound Publishing, Inc., respectfully demand trial by jury.

Dated: October 10, 2019

/s/ Peter Anderson
Peter Anderson, Esq.
DAVIS WRIGHT TREMAINE LLP
Attorneys for Plaintiffs
ZACHRY BROWN,
NO RESERVE, INC., and
WEIMERHOUND PUBLISHING, INC.